# IN THE SUPREME COURT OF MISSISSIPPI

# NO. 2020-IA-01116-SCT

*DR. BENJAMIN RUSH*

*v.*

*RUSH HEALTH SYSTEMS, INC., PHYSICIAN
SERVICES, LLC, MEDICAL FOUNDATION, INC.
AND RUSH MEDICAL FOUNDATION d/b/a RUSH
FOUNDATION HOSPITAL*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/08/2021 |
| TRIAL JUDGE: | HON. RICHARD W. McKENZIE |
| TRIAL COURT ATTORNEYS: | J. TUCKER MITCHELL |
| | JULIE BOWMAN MITCHELL |
| | PHILIP JOSEPH CHAPMAN |
| | WILLIAM E. WHITFIELD, III |
| | KAREN KORFF SAWYER |
| | KACEY GUY BAILEY |
| | JACOB O. MALATESTA |
| | WILLIAM T. MAY |
| | LEE THAGGARD |
| | MILDRED M. MORRIS |
| | THOMAS L. KIRKLAND, JR. |
| | TIMOTHY LEE SENSING |
| COURT FROM WHICH APPEALED: | LAUDERDALE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JACOB O. MALATESTA |
| | JULIE BOWMAN MITCHELL |
| | ELLEN PATTON ROBB |
| | PHILIP JOSEPH CHAPMAN |
| ATTORNEYS FOR APPELLEES: | WILLIAM T. MAY |
| | LEE THAGGARD |
| NATURE OF THE CASE: | CIVIL - CONTRACT |
| DISPOSITION: | DISMISSED WITHOUT PREJUDICE AND REMANDED - 04/20/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE RANDOLPH, C.J., MAXWELL AND BEAM, JJ.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.     The matter before us follows this Court's January 2021 order granting Dr. Benjamin Rush's interlocutory appeal from the Lauderdale County Circuit Court's discovery order in Dr. Rush's wrongful termination suit against Rush Hospital and other defendants.[1]  This Court remanded the matter to the trial court for an *in camera* review of the discovery documents sought by Dr. Rush that the trial court had summarily ruled were statutorily protected under Mississippi Code Sections 41-63-9 (peer review) and -23 (quality assurance) as confidential and privileged.  En Banc Order, ***Rush v. Rush Health***, No. 2020-M-01116-SCT (Miss. Jan. 20, 2021).

¶2.     On remand, the trial court conducted an *in camera* review of approximately 3,033 document pages.  On July 8, 2021, the trial court entered a detailed discovery order ordering that certain documents be produced, while denying the production of other documents.  The trial court subsequently filed its discovery order with this Court on July 13, 2021.  To our knowledge, no proceedings have taken place in the trial court with regard to the discovery order since it issued and was filed with this Court.

¶3.     Dr. Rush claims the trial court erred in its discovery order as follows:

---

[1]  Dr. Rush claimed breach of the implied covenant of good faith and fair dealing; breach of contract and breach of policies and procedures; retaliatory discharge; infliction of emotional distress; defamation; libel/slander; and tortious interference with business relations and prospective employment.

I.     The Circuit Court erred in determining that the Peer Review and Quality Assurance Privileges applied in this case when Dr. Rush makes specific factual allegations alleging *malicious* conduct.

II.    Three of the four hospital defendants are holding documents and information which cannot possibly be protected by the Peer Review or Quality Assurance Privilege.

III.   Rush Foundation Hospital's withheld documents cannot possibly be privileged because they were created outside of a peer review or compliance committee.

IV.    The Circuit Court's ruling is now being used by other defendants to prevent legitimate discovery.

¶4.    Because all that we have before us is the trial court's discovery order, we address only the first issue concerning the malicious conduct exception to the peer review and quality assurance privileges. The documents reviewed *in camera* by the trial court are not included in the record. In addition to finding certain documents protected by either peer review and/or quality assurance privileges, the discovery order also finds that certain documents are protected by the attorney-client privilege, the attorney-work product doctrine, and/or work product prepared in anticipation of litigation. These privileges have not yet been challenged in the trial court. Therefore, we will speak only to the malice exception pertaining to Sections 41-63-9 and -23 purely as a question of law.

**DISCUSSION**

¶5.    As this Court explained in *Claypool v. Mladineo*, 724 So. 2d 373, 377 (Miss. 1998) (quoting Miss. Code Ann. § 41-63-29) (Supp. 1997)) , "[t]he Legislature enacted [Sections] 41-63-9 and 41-63-23 as part of the substantive law of this state for the 'express purpose of

3

promoting quality patient care through accreditation and quality assurance functions.'"

¶6.    Section 41-63-9 reads:

**Discoverability and admissibility into evidence of proceedings and records of review committees.**

(1) Notwithstanding any conflicting statute, court rule or other law, in order to encourage medical and dental review activity, the proceedings and records of any medical or dental review committee shall be confidential and shall not be subject to discovery or introduction into evidence in any civil action arising out of the matters which are the subject of evaluation and review by such committee. No person who was in attendance at a meeting of such committee shall be permitted or required to testify in any civil action regarding any evidence or other matters produced or presented during the proceedings of the committee or as to any findings, recommendations, evaluations, opinions or other actions of the committee or its members. However, information, documents or records otherwise discoverable or admissible from original sources are not to be construed as immune from discovery or use in any civil action merely because they were presented during the proceedings of such committee, nor should any person who testifies before such committee or who is a member of such committee be prevented from testifying as to other matters within his knowledge. Provided, however, a witness shall not be questioned concerning his participation on or testimony before such committee or opinions formed by him as a result of such committee hearings or proceedings.

(2) The provisions of subsection (1) of this section which limit the discovery of medical or dental review committee records and proceedings shall not apply in any legal action brought by a medical or dental review committee to restrict or revoke a physician's license to practice medicine or hospital staff privileges, or in any legal action brought by an aggrieved physician against any member of the committee or the legal entity which formed such committee *for actions alleged to have been malicious*.

(3) The provisions of this statute, including the confidentiality provided in this subsection, shall be deemed part of the substantive law of this state enacted for the expressed legislative purpose of promoting quality patient care through medical and dental peer review activities.

Miss. Code Ann. § 41-63-9 (Rev. 2018) (emphasis added).

¶7.     Section 41-63-23 reads:

**Accreditation and quality assurance materials of health-care organizations; discovery or introduction into evidence in civil actions; admissibility of testimony relating to preparation, evaluation or review of materials; admissibility of documents from original sources.**

Accreditation and quality assurance materials, as defined in Sections 41-63-21 through 41-63-29, shall be held in confidence and shall not be subject to discovery or introduction into evidence in any civil action against the health care professional or institution. No person involved in preparation, evaluation or review of accreditation or quality assurance materials shall be permitted or required to testify in any civil action as to any evidence or other matters produced or presented during the course of preparation, evaluation or review of such materials or as to any finding, recommendation, evaluation, opinion, or other action of such accreditation or quality assurance or other person involved therein. Information, documents or records otherwise available from original sources are not to be construed as being unavailable for discovery or for use in any civil action merely because they were presented or used in preparation of accreditation or quality assurance materials, nor should any person involved in preparation, evaluation or review of such materials be prohibited from testifying as to matters within his knowledge, but the witness testifying should not be asked about any opinions or data given by him in preparation, evaluation or review of accreditation or quality assurance materials.

Miss. Code Ann. § 41-63-23 (Rev. 2018). While this Section does not mention malice, the

next Section provides as follows:

**Accreditation and quality assurance materials of health-care organizations; use of materials in proceedings relating to restriction or revocation of physician's license.**

The provisions of Section 41-63-23 shall not apply in any legal action brought by a hospital or other health care entity to restrict or revoke a physician's license to practice medicine or hospital staff privileges, or in any legal action brought by an aggrieved physician against any hospital, health care

5

entity, or person acting on behalf of any such entity *for actions alleged to have been malicious.*

Miss. Code Ann. § 41-63-25 (Rev. 2018) (emphasis added).

¶8. The *Claypool* Court was tasked with construing Sections 41-63-9 and -23 for the first time in a medical malpractice suit brought by a patient against the treating physician. *Claypool*, 724 So. 2d at 381. The malice exceptions were not at issue and were not addressed in *Claypool*.

¶9. In speaking to the purpose behind these sections, *Claypool* said they were intended "to foster an environment where the health care providers could and would self-police themselves and promote quality patient care through accreditation and quality assurance functions by implementing committees that would review medical staff members' activities." *Id.* at 381. Those who participate on medical review committees, and those who provide information to such committees, do so with the expectation that such information will remain confidential. *Id.* at 377. The members must be allowed to discuss "matters freely," and the committees must be allowed "to take action without outside influence." *Id.* at 380. Without some privilege of confidentiality, many physicians would be unwilling to serve on peer review or quality assurance committees "and would not feel free to openly discuss the performance of other doctors practicing in the hospital[.]" *Id.* at 383 (quoting *Trinity Med. Ctr., Inc. v. Holcum*, 544 N.W.2d 148, 155 (N.D. 1996)).

¶10. While *Claypool* recognized the necessity of these statutes to promote self-policing among medical providers in order to provide the best medical care possible to patients, the

Court also iterated that these statutes "are in conflict with the general policy favoring discovery and admissibility of probative evidence." *Id.* at 382.

> "Whatever their origins, these exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon*, 418 U.S. 683, 710, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974). "Testimonial exclusionary rules and privileges contravene the fundamental principle that 'the public has a right to every man's evidence.'" *Trammel v. United States*, 445 U.S. 40, 50, 100 S. Ct. 906, 63 L. Ed. 2d 186 (1980) (quoting *United States v. Bryan*, 339 U.S. 323, 331, 70 S. Ct. 724, 94 L. Ed. 884 (1950)). "Exceptions from the general rule disfavoring testimonial privileges may be justified, however, by a 'public good transcending the normally predominant principle of utilizing all rational means for ascertaining truth.'" *Jaffee v. Redmond*, 518 U.S. 1, 9, 116 S. Ct. 1923, 135 L. Ed. 2d 337 (1996) (citations omitted).

*Id.* at 383.

¶11.    *Claypool* looked at numerous other states for their treatment of similar statutes, and it found that similar privileges widely vary. *Id.* at 381. *Claypool* pointed out:

> It has been noted that "there is extremely wide variation in the privilege granted by the states," and that "there is little consistency in the entities covered or types of information protected." Susan O. Scheutzow & Sylvia Lynn Gillis, *Confidentiality and Privilege of Peer Review Information: More Imagined Than Real*, 7 J.L. & Health 169, 186–187 (1992–1993); *see also* Ernest J. Naufel, Jr., *Physician Peer Review—Is it Really Confidential?*, 45 Fed'n Ins. & Corp. Couns. Q. 229, 229–230 (1995). As a result, the case law interpreting these widely varying statutes has been described as "creating a crazy quilt effect among the states." Scheutzow & Gillis, *supra*, 7 J.L. & Health at 188; see also Naufel, supra, 45 Fed'n Ins. & Corp. Couns. Q. at 230 ("There are as many different approaches to a resolution of this situation as there are appellate courts and legislatures."); Charles David Creech, *The Medical Review Committee Privilege: A Jurisdictional Survey*, 67 N.C.L.Rev. 179, 212 (1988). Thus, although nearly every state has some form of statutory privilege for medical peer review, it appears that no two statutes, or courts' interpretations of them, are alike.

7

*Id.* at 381-82 (quoting *Holcum*, 544 N.W.2d at 153).

¶12.    *Claypool* observed that while "different states employ corresponding language in their peer review statutes, the scope granted to each varies according to the varying judicial interpretations." *Id.* at 383. *Claypool* found that the "breadth of the scope afforded to each state's statutes is dependent upon the exact language contained" in the statute. *Id.*  And *Claypool* found that the "narrow approach" taken by a number of the states it had surveyed was "the approach probably intended by [our] Legislature." *Id.* at 385.

¶13.    *Claypool* favorably cited the North Dakota Supreme Court in *Holum*, which had noted the importance of following the intent behind North Dakota's peer review statutes. *Claypool* quoted the following from *Holum*:

> We must be particularly vigilant against extending the scope of the privilege beyond that warranted by the purpose expressed in the language of the statute. In this regard, we agree with the rationale expressed by the Supreme Court of Rhode Island in *Moretti v. Lowe*, 592 A.2d 855, 857-858 (R.I. 1991):
>
>> "In enacting our peer-review statute, the Legislature recognized the need for open discussions and candid self-analysis in peer-review meetings to ensure that medical care of high quality will be available to the public.  That public purpose is not served, however, if the privilege created in the peer-review statute is applied beyond what was intended and what is necessary to accomplish the public purpose.  The privilege must not be permitted to become a shield behind which a physician's incompetence, impairment, or institutional malfeasance resulting in medical malpractice can be hidden from parties who have suffered because of such incompetence, impairment, or malfeasance."
>
> Accordingly, we determine the scope of the peer review privilege from the language of our statutes and the purpose that language was intended to

8

achieve.

*Claypool*, 724 So. 2d at 385-86 (quoting *Holum*, 544 N.W.2d at 154).

¶14.    *Claypool* likewise found that our statutes "were never intended to shield hospitals from potential liability." *Id.* at 386.  Rather, "[t]he confidentiality and non-discovery of the peer review proceedings were designed to advance the quality of health care by ensuring medical professionals would engage in self-evaluation of their peers." *Id.*  *Claypool* stated, "[i]n short, the statute was designed to allow the medical profession to 'weed out the bad apples.'" *Id.*

¶15.    Ultimately, *Claypool* analogized a "medical peer review committee to be much like a jury deliberation, and near sacred." *Id.* at 389.  *Claypool* said that "[i]n examining the jury and its deliberations one can examine the evidence submitted to the jury and the verdict reached by the jury, but what actually takes place in the jury room is 'non-discoverable.'" *Id.*  Similarly, "the information which was considered and discussions had during [peer-review] proceedings are non-discoverable." *Id.*

¶16.    *Claypool* stressed though that our statutes "should not be used in an attempt to make all of the information presented to committee and the persons who are members of peer review committees or present during those proceedings non-discoverable." *Id.*  This would go "against the plain language of the statutes." *Id.*

¶17.    *Claypool* concluded,

> Information, records or documents submitted to peer review committees should not be privileged merely because they were presented to the committee.

9

If a plaintiff can find the identical information from another source separate and outside of the peer review proceeding, he should be able to discover and use the evidence in his civil suit against the defendants. If a plaintiff can elicit testimony from a person who was present during the proceedings without asking "tell me what you told them," he should be able to get the same opinions in the form of responses to properly phrased interrogatories or through deposition testimony.

The statutes do not allow a plaintiff to inquire as to the peer review proceedings themselves. A plaintiff is not entitled to a transcript of the medical peer review committee proceeding to determine what was discussed or considered by the committee. But, a plaintiff is entitled to information and documents presented to the committee in order to know what and where to find the information otherwise discoverable from original sources. Additionally, defendants who assert the privilege should be required to provide the names and addresses of all present during the medical peer review committee proceedings to the plaintiffs so that they might schedule depositions of those persons.

Anything otherwise discoverable is still discoverable. Any other interpretation will abrogate the Mississippi Rules of Evidence and the Mississippi Rules of Civil Procedure.

***Id.***

¶18. Neither this Court or the Court of Appeals has addressed the peer review and/or the quality assurance privileges in a case in which a physician claims that he or she was aggrieved by a peer review committee's decision on the basis of malice. Both this Court and the Court of Appeals have reviewed a number of cases dealing with a physician's hospital privileges as provided by Mississippi Code Section 73-25-93 (Rev. 2022). This Section states as follows:

(1) Any hospital licensed pursuant to Sections 41-9-1 et seq. is authorized to suspend, deny, revoke or limit the hospital privileges of any physician practicing or applying to practice therein, if the governing board of

10

such hospital, after consultation with the medical staff considers such physician to be unqualified because of any of the acts set forth in Section 73-25-83; provided, however, that the procedures for such actions shall comply with the hospital and/or medical staff bylaw requirements for due process.

(2) There shall be no liability on the part of, and no cause of any action of any nature arising against, any hospital, hospital medical staff or hospital disciplinary body or members thereof, or their agents or employees, *for any action taken without malice* in carrying out the provisions of Sections 73-25-81 through 73-25-95.

Miss. Code Ann. § 73-25-93 (Rev. 2022) (emphasis added).

¶19. Speaking to this Section, this Court said,

In § 73-25-93, the legislature recognized the authority of a licensed hospital to control and regulate its staff privileges. The statute delineates no distinction between private or public hospitals in that it refers to any licensed hospital. Our legislature has engraved into this statute its view that a licensed hospital's decision to "suspend, deny, revoke or limit" any physician's privileges shall not be subject to judicial review unless the procedures followed violated the licensed hospital's "bylaw requirements for due process."

*Wong v. Garden Park Cmty. Hosp., Inc.*, 565 So. 2d 550, 553 (Miss. 1990). Thus, our scope of review in such matters is "constricted . . . to consider only whether the procedures followed by [a hospital] violated its own bylaw provisions for due process." *Id.* The reason for limited review was expressed by this Court in an earlier case as follows:

No court should substitute its evaluation of such matters for that of the Hospital Board. It is the Board, not the court, which is charged with the responsibility of providing a competent staff of doctors. The Board has chosen to rely on the advice of its Medical Staff, and the court cannot surrogate for the Staff in executing this responsibility. Human lives are at stake, and the governing board must be given discretion in its selection so that it can have confidence in the competence and moral commitment of its staff. The evaluation of professional proficiency of doctors is best left to the specialized

11

expertise of their peers, subject only to limited judicial surveillance. The court is charged with the narrow responsibility of assuring that the qualifications imposed by the Board are reasonably related to the operation of the hospital and fairly administered. In short, so long as staff selections are administered with fairness, geared by a rationale compatible with hospital responsibility, and unencumbered with irrelevant considerations, a court should not interfere. Courts must not attempt to take on the escutcheon of Caduceus.

*Lloyd v. Jefferson Davis Mem'l Hosp.*, 345 So. 2d 1046, 1048 (Miss. 1977) (emphasis omitted) (quoting *Sosa v. Bd. of Managers of Val Verde Mem'l Hosp.*, 437 F.2d 173 (5th Cir. 1971)).

¶20. *Wong* recognized that this "statutory scheme does not foreclose an independent legal action to determine the propriety of the termination on the facts." *Wong*, 565 So. 2d at 553 (quoting *Wong v. Stripling*, 881 F.2d 200, 202 (5th Cir. 1989)). In a subsequent appeal, after finding that the physician had been afforded the process he was due, this Court opined that the physician was "entitled to pursue whatever claims involving malice he has remaining, providing that they are not barred by res judicata or collateral estoppel." *Wong v. Stripling*, 700 So. 2d 296, 308 (Miss. 1997), *overruled on other grounds by Adams v. U.S. Homecrafters, Inc.*, 744 So. 2d 736 (Miss. 1999)).

¶21. Like Mississippi, most if not all states have a liability and/or immunity provision contained in their respective peer review law.[2] And most states have some type of malice or

---

[2] Mississippi's immunity provision is set forth by Mississippi Code Section 41-63-5, which provides as follows:

No physician, dentist, pharmacist, nurse, hospital, organization or institution furnishing information, data, reports or records under Section

12

bad faith exception and/or good faith requirement in their liability or immunity provisions.

¶22.   Texas, for example, has a peer review immunity statute which provides that

> [a] member of a medical committee is not liable for damages to a person for an action taken or recommendation made within the scope of the functions of the committee if the committee member acts without malice and in the reasonable belief that the action or recommendation is warranted by the facts known to the committee member.

Tex. Health & Safety Code § 161.033.  But Texas does not  have a malice exception that pertains to its discovery-privilege statute.  Tex. Health & Safety Code § 161.032.

¶23.   The Texas Supreme Court addressed the effect of this in *Irving Healthcare System v. Brooks*, 927 S.W.2d 12 (Tex. 1996).  In *Brooks*, a plaintiff/doctor was denied staff privileges to a number of hospitals to which he had applied.  *Id.* at 14-15.  Another doctor, who was a peer-review member at the hospital where the plaintiff was previously on staff, had sent various forms and letters to these hospitals after they had inquired about the plaintiff.  *Id.*

¶24.   The plaintiff sued the doctor and the former hospital for libel, slander, intentional

---

41-63-3 or 41-63-4 shall, by reason of furnishing such information be liable in damages to any person.  No hospital, hospital governing body, medical or dental review committee, or member of such a committee or governing body, or employee thereof, shall be liable in damages to any person for any action taken or recommendation made within the scope of the functions of any medical or dental review committee if such committee or committee member *acts without malice and in the reasonable belief* that such action or recommendation is warranted by the facts known to him at the time of such action or recommendation.

Miss. Code Ann. § 41-63-5 (Rev. 2018) (emphasis added).

infliction of mental anguish, and interference with business relations. *Id.* at 15. The plaintiff alleged that the doctor intentionally and maliciously supplied false information, thereby damaging or destroying the plaintiff's ability to gain admittance to the hospitals which he had applied. *Id.* at 14-15.

¶25.    The plaintiff requested that the defendants produce all documents in their possession related to the plaintiff. *Id.* at 15. The plaintiff also sought depositions from the defendants and other doctors pertaining to the matter. *Id.* The doctors appeared at their depositions but refused to answer questions concerning the existence or substance of their communications concerning the plaintiff. *Id.* at 15.

¶26.    Following an *in camera* review by the trial court of the documents requested by the plaintiff, the trial court denied the motions for protective orders and ordered production of the documents. *Id.* The trial court also ordered the doctors to respond to the questions they had declined to answer in their depositions. *Id.*

¶27.    The defendants sought mandamus relief from the Texas Supreme Court. *Id.* at 15. The Texas Supreme Court conditionally granted the writ in part. *Id.* at 14. Because not all of the sought discovery documents were included in the record, the *Brooks* Court held that mandamus relief was not appropriate. *Id.* at 21-22. The *Brooks* Court did, however, address the controlling statutes and provided limited instruction to the trial court for further proceedings. *Id.* at 16-22.

¶28.    *Brooks* explained that "[t]here are two intertwined but distinct protections extended

to the peer review process under [Texas law]." *Id.* at 16. "The first is protection from discovery of the records, proceedings, and communications to a peer review committee." *Id.* "The second is qualified immunity from civil liability." *Id.*

¶29.  *Brooks* said the provisions providing immunity from civil liability "draw the line at malice." *Id.*  But, it does not follow that an allegation or even proof of malice, which would negate immunity from civil liability would also negate the discovery privilege. *Id.*  Texas law "does not provide an exception to its confidentiality provisions whenever a plaintiff presents a prima facie case of malice." *Id.* at 17.

¶30.  *Brooks* explained,

> Read as a whole, the statute reflects the Legislature's conscious decision to allow an affected physician to bring claims against those who participate in the peer review process maliciously and without good faith, but nevertheless to maintain the confidentiality of the peer review process. That choice is a logical one. If a litigant could overcome the barrier to discovery by merely alleging malice, the privilege would be substantially emasculated. Requiring a prima facie showing of malice adds little protection. The overarching purpose of the statute is to foster a free, frank exchange among medical professionals about the professional competence of their peers. The Legislature recognized the chilling effect that would be engendered by enfeebling confidentiality.

*Id.*

¶31.  *Brooks* acknowledged that there would be potential problems for litigants whose proof that the peer review committee acted with malice would depend upon the peer review committee's privileged documents. *Id.* at 18.  And "[i]t may be possible that in some instances, the privilege from discovery could effectively bar proof of a medical practitioner's claim that a participant in the peer review process acted maliciously or without good faith."

15

*Id.*

¶32.   Ultimately though, ***Brooks*** said "the terms of the statute do not mandate that result."

*Id.*  ***Brooks*** opined that "[t]here are several means by which confidential information may

be disclosed to an affected physician."  *Id.*  ***Brooks*** noted that the plaintiff was in possession

of two letters written by the doctor to two of the hospitals the plaintiff had applied for

privileges.  *Id.*  And it reiterated that the statute does not prohibit discovery from alternative

sources.  *Id.*

> For example, a medical peer review committee may have obtained and
> reviewed a copy of a letter from a physician, but that document is not thereby
> clothed with a privilege if its author or recipient share it with individuals or
> entities that do not come under the umbrella of the [confidentiality provision].

*Id.*

¶33.   Tennessee's peer review law is similar to Texas's in that it "grants qualified immunity

from liability for damages for actions taken 'in good faith and without malice and on the

basis of facts reasonably known or reasonably believed to exist.'"  ***Eyring v. Fort Sanders***

***Parkwest Med. Ctr.***, 991 S.W.2d 230, 236 (Tenn. 1999) (quoting Tenn. Code Ann. § 63-6-

219(c)(1)).  Like Texas, Tennessee's peer-review law does not expressly contain a malice

exception for its discovery-privilege statute.  But the Tennessee Supreme Court has not

interpreted (or rather applied) its privilege statute as rigidly as the Texas Supreme Court has.

¶34.   In ***Eyring***, for example, a physician sued a hospital that had revoked his clinical

privileges, claiming "breach of contract, intentional interference in contract, intentional

interference in prospective business expectancy, and intentional discriminatory interference

16

in his right to engage in his profession at the hospital." *Id.* at 234. Over the hospital's objection, the trial court allowed discovery of peer-review participants for the limited purpose of allowing the plaintiff the opportunity "to discover the committee members' good faith, malice, and whether they acted on the basis of facts reasonably known or believed to exist." *Id.* The trial court subsequently sustained the hospital's objections that the plaintiff "was seeking privileged information about the peer review committees' deliberative process and granted the hospital's motion for summary judgment." *Id.*

¶35. The Tennessee Supreme Court affirmed. It rejected the plaintiff's contention that Tennessee's peer-review law grants "an implicit right to any information 'furnished to or resulting from the proceedings' of the peer review committees." *Id.* at 239. *Eyring* held, though, "that the broad language extending the privilege from discovery must be reconciled with the statutory requirement that the plaintiff bear the burden of producing evidence of malice and bad faith." *Id.* *Eyring* stated, "We therefore agree with the trial court's ruling allowing [the plaintiff] to conduct discovery for the limited purpose of investigating the committee members' good faith, malice, and reasonable knowledge or belief, but prohibiting any inquiry into the peer review process itself." *Id.* (citation omitted).

¶36. The Pennsylvania Supreme Court held that the confidentiality provision in its peer review law does not apply when a physician challenges the process of the review and not the issues that were the subject of the committee's evaluation. *Hayes v. Mercy Health Corp.*, 739 A.2d 114 (Pa. 1999). In *Hayes*, a plaintiff/physician challenged the recommendation of

17

the defendant hospital's medical board regarding suspension of his clinical privileges. *Id.* at 115. During litigation, the plaintiff requested a copy of the tape recording of the medical board's meeting during which the board deliberated and decided upon its recommendation. *Id.* The defendant objected, claiming that recording was confidential and privileged from discovery. *Id.*

¶37.  The Pennsylvania Supreme Court disagreed, finding that the confidentiality provision applied in "civil action[s] . . . arising out of matters which are the subject of evaluation and review by the peer review committee." *Id.* at 118 (quoting 63 Pa. Cons. Stat. § 425.4). The *Hayes* Court found that the plaintiff's lawsuit did not fall within the scope of the limitation because the plaintiff was challenging the proceeding and not the issues that were the subject of the of the evaluation by the board. *Id.* The *Hayes* Court concluded that the intent of its legislature

> was to prevent disclosure of peer review information to outside parties seeking to hold professional health care providers liable for negligence, while at the same time ensuring that such guarantee of confidentiality did not operate to shield from discovery those rare instances in which the peer review process was misused.

*Id.*

¶38.  In another case brought by an aggrieved physician suing for damages in an alleged misuse of the peer review process, the Pennsylvania Supreme Court held that the trial court rightly prohibited inquiries by the plaintiff into the peer review activities involving other doctors. *Cooper v. Del. Valley Med. Ctr.*, 630 A.2d 1, 23-24 (Pa. 1993). The plaintiff "was

18

not precluded from asking any questions or discovering any material concerning his own peer review activity[,]" but to allow the plaintiff to delve into the peer review activity of others would contravene the purpose of the confidentiality provision. *Id.* at 24.

¶39.    Lastly, Maryland's peer review law appears similar to Pennsylvania's in its scope and its case-law application. In a case pointed out to us by Dr. Rush at oral argument in this matter, the Maryland Court of Appeals held that the broad statutory protection afforded by its confidentiality provision "has no application in a civil action initiated . . . by a physician who is the subject (a party to the proceedings) of the medical review committee." *Baltimore Sun Co. v. Univ. of Md. Med. Sys. Corp.*, 584 A.2d 683, 687 (Md. 1991). The court explained that "[i]n such limited circumstances . . . medical review committee records are not insulated from either discovery or admissibility in evidence in a civil action." *Id.*

¶40.    The Maryland Court of Appeals expounded on *Baltimore Sun Co.* in *Maryland Board of Physicians v. Geier*, 123 A.3d 601, 620 (Md. 2015). *Geier* held that "[t]he 'all encompassing' 'rule of confidentiality' yields only so far as 'to allow a physician who is the subject of a peer review to obtain the records for use in that physician's challenge to the peer review conclusions.'" *Id.* (quoting *Baltimore Sun Co.*, 584 A.2d at 688 (Rodowsky, J., concurring)). Simply put, "physicians may discover their own files—the files from the case in which they were 'the subject' or 'a party[;]'" but "[t]hey cannot . . . discover someone else's files." *Id.* "[T]he rule of confidentiality is suspended only to the extent necessary to achieve the purpose of the suspension.'" *Id.* (internal quotation marks omitted) (quoting

19

***Baltimore Sun Co.***, 584 A.2d at 688 (Rodowsky, J., concurring)).

¶41.    Mississippi lies somewhere in between the absolute bar that Texas law provides and the limited exception that Maryland and Pennsylvania law provides in matters involving an aggrieved physician.

¶42.    Unlike Texas, our peer review law expressly contains a malice exception that pertains to our confidentiality or discovery-privilege provisions.  Miss. Code §§ 41-63-9 and -23.  Texas has explicitly held that no such exception exists for its confidentiality or discovery-privilege provisions even when "a plaintiff presents a prima facie case of malice." ***Brooks***, 927 S.W.2d at 17.

¶43.    Conversely, both Maryland and Pennsylvania except from their privilege provisions actions initiated by a physician who is the subject of the medical peer review committee. Malice is not a necessary condition in those states.

¶44.    But it is in Mississippi.[3]   And given so, we reject Dr. Rush's contention that all that

---

[3]  Use of the term malice *exception* throughout this opinion is largely semantics.  It would be fitting to use the term malice *requirement* or *condition* when comparing Mississippi law to Maryland or Pennsylvania law.

We also agree with the Maryland and Pennsylvania Supreme Courts' viewpoint that an aggrieved physician should only be allowed to discover information pertaining to his or her own peer review activity, and not that of other physicians. From the standpoint of Mississippi law, if the malice exception or condition is met in a Mississippi case, then—similar to Maryland and Pennsylvania—the aggrieved physician still will only be allowed to obtain privileged information pertaining to his or her own peer review activity. The physician would not be permitted to delve into the peer review activity of other physicians to further his or her malice claim(s).

is required to lift the peer-review privilege(s) is a maliciousness allegation by an aggrieved physician.

¶45.    As a matter of common-sense interpretation, requiring only an allegation of maliciousness would render the malice exception itself superfluous.  Mere artful pleading would suffice in every instance no matter the prospect of malice.

¶46.    In construing a statute, "[t]he entire statute must be construed together, and effect given to every part of it, if it can be done without manifestly violating the intent of the legislature."  *Moore v. State*, 287 So. 3d 905, 918 (Miss. 2019) (internal quotation mark omitted) (quoting *State ex rel. Pair v. Burroughs*, 487 So. 2d 220, 226 (Miss. 1986)).  "A construction which will render any part of a statute inoperative, superfluous, or meaningless is to be avoided."  *Id.* (internal quotation mark omitted) (quoting *Burroughs*, 487 So. 2d at 226).  Had the Legislature intended the result Dr. Rush contends, it could have excluded the malice exception pertaining to Sections 41-63-9, -23, and -25 and simply left these sections with an "aggrieved physician" exception.

¶47.    *Claypool* "determin[ed] the scope of the peer review privilege from the language of our statutes and the purpose that language was intended to achieve."  *Claypool*, 724 So. 2d at 385-86 (quoting *Holum*, 544 N.W.2d at 154).  As *Claypool* said, "[t]he confidentiality and non-discovery of the peer review proceedings were designed to advance the quality of health care by ensuring medical professionals would engage in self-evaluation of their peers."  *Id.* "In short, the statute was designed to allow the medical profession to 'weed out the bad

21

apples.'" *Id.*

¶48.    We point out the following discovery standard that this Court held applied in a case when the plaintiff suing for libel in circuit court sought discovery of "qualifiedly privileged" mercantile credit reports on the claim that the reports "were made from an improper, malicious motive, and not for a reason which would otherwise render them privileged." *Garraway v. Retail Credit Co.*, 244 Miss. 376, 141 So. 2d 727, 729 (1962) (internal quotation marks omitted) (quoting *Retail Credit Co. v. Garraway*, 240 Miss. 230, 126 So. 2d 271 (1961)).

> Before movant is entitled to production of qualifiedly privileged documents, he must present facts, on the hearing on the motion, which establish a prima facie case in his favor with reference to (1) the materiality and relevancy of the information in question, (2) disclosure is necessary or essential to the proper development of the cause of action, (3) the information is not otherwise available, and (4) the respondent to the motion has exceeded the qualified privilege by malice and bad faith.

*Id.* at 732 (citations omitted).

¶49.    The *Garraway* Court reiterated its previous holding in the same case, which had proceeded in chancery court on the complainant's bill of discovery seeking access to the credit reports. *Garraway*, 141 So. 2d at 730. In the chancery matter, this Court had reversed the chancery court's bill-of-discovery decree that required the defendants to produce the reports. *Garraway*, 126 So. 2d at 275. This Court found that the complainant had failed in her burden of proof to show that the reports "were made from an improper, malicious motive, and not for a reason which would otherwise render them privileged." *Id.*

22

¶50.   While the chancery court's discovery decree was pending on appeal to this Court, the plaintiff in *Garraway* had filed three more libel suits in the circuit court against the same company and had added additional defendants. *Garraway*, 141 So. 2d at 729. The plaintiff filed a motion for inspection and production of the mercantile credit reports, which the circuit court denied. *Id.* at 732. This Court affirmed the circuit court, saying that "this [was] an issue for the trial court in its sound discretion." *Id.* (citing *La. Oil Corp. v. Renno*, 173 Miss. 609, 157 So. 705 (1934)). The plaintiff had offered no evidence on her motion to comply with her burden of proof to show that the respondent had exceeded the privilege by publishing the reports with malice and bad faith. *Id.*

¶51.   We hold that the same discovery standard applied in *Garraway* applies for purposes of Sections 41-63-9, -23, and -25. Before a physician is entitled to production of documents or information privileged by Section 41-63-9 and/or Section 41-63-23, he or she must present facts to the court that establish a prima facie case in his or her favor that: (1) the information in question is material and relevant, (2) disclosure is necessary or essential to the proper development of the cause of action, (3) the information is not otherwise available, and (4) the respondent shielded by the privilege has exceeded the qualified privilege by malice. *Garraway*, 141 So. 2d at 732.

¶52.   We reiterate that when a "qualified privilege exists, a presumption of good faith arises." *Barmada v. Pridjian*, 989 So. 2d 359, 364 (Miss. 2008) (citing *Hayden v. Foryt*, 407 So. 2d 535, 539 (Miss. 1981)). To defeat this presumption, a plaintiff must present

evidence of actual malice. *Id.* This Court has held that,

> "[a]ctual or express malice, as distinguished from malice in law, in its ordinary
> sense denotes ill will, a sentiment of hate or spite, especially when harbored
> by one person towards another, and exists when one with a sedate, deliberate
> mind and formed design injuries another, as where the person is actuated by
> ill will in what he does and says, with a design to willfully or wantonly injure
> another."

*Id.* (quoting *Young v. Jackson*, 572 So. 2d 378, 385 (Miss. 1990)).

¶53. For purposes of discovery, "this is an issue for the trial court in its sound discretion." *Garraway*, 141 So. 2d at 732. How the court decides to proceed in making a determination is a matter that also lies within the court's discretion. "Pre-trial discovery is governed by flexible rules well within the administrative capacity of our trial courts." *Haynes v. Anderson*, 597 So. 2d 615, 617 (Miss. 1992) (quoting *In re Knapp*, 536 So. 2d 1330, 1333 (Miss. 1998)).

¶54. We also reiterate that whether or not to conduct an *in camera* review of privileged documents generally falls within the trial court's discretion. *Hewes v. Langston*, 853 So. 2d 1237, 1246 (Miss. 2003). In *Hewes*, we held that before a trial court may engage in an *in camera* review of privileged documents, "the party seeking disclosure must show 'a factual basis adequate to support a good faith belief by a reasonable person' that an *in camera* review will show the applicability of [an] exception" to the privilege. *Id.* (quoting *United States v. Zolin*, 491 U.S. 554, 572, 109 S. Ct. 2619, 2619, 105 L. Ed. 2d 469 (1989)). "The evidentiary burden that the party seeking disclosure must meet before in camera review is appropriate is therefore significantly less than is needed to actually overcome the privilege

24

itself." *Id.* (citing *Zolin*, 491 U.S. at 572).

¶55. Here, the trial court had summarily found that the "matters of discovery sought by the Plaintiff are confidential and are privileged, and the same are statutorily protected under Miss. Code Ann. Section 41-63-9." We ordered the trial court to conduct an *in camera* review of Dr. Rush's discovery requests so as not to run afoul of *Claypool*'s admonition that anything not privileged by the peer-review statutes "is still discoverable." *Claypool*, 724 So. 2d at 389.

¶56. Afterward, the trial court conducted an *in camera* review of approximately 3,033 document pages and entered a detailed discovery order instructing that certain documents be produced, while denying the production of other documents. In addition to finding certain documents protected by either peer review and/or quality assurance privileges, the discovery order also found that certain documents are protected by the attorney-client privilege, the attorney-work product doctrine, and/or work product prepared in anticipation of litigation.

¶57. As mentioned, the documents reviewed by trial court are not included in the record. Following oral argument in this case, Dr. Rush filed a motion with this Court to supplement the record with these documents along with other documents that either were inadvertently omitted from the appellate record or were produced or created after certification of the record.

¶58. Dr. Rush's motion to supplement the record and his motion to file exhibits under seal are denied. We retained jurisdiction of this interlocutory appeal after the trial court filed its

25

discovery order with this Court to address the malice exception that pertains to Sections 41-63-9 and 23, based solely on a question of law. We do not address the merits of the trial court's discovery order or speak to any of the claims alleged by Dr. Rush.

¶59.   "Rarely will we entertain an interlocutory appeal regarding a discovery matter." *Miss. State Bar v. Att'y L*, 511 So. 2d 119, 121 (Miss. 1987).  "[A]s a general rule, this Court has declared that it 'is not about to become involved in wholesale granting of interlocutory appeals of civil discovery disputes.[']" *Haynes*, 597 So. 2d at 617 (quoting *Knapp*, 536 So. 2d at 1333). A limited exception exists "for substantial questions of privilege . . . where correction of any error on appeal from a final judgment would be futile." *Haynes*, 597 So. 2d at 617 (alteration in original) (quoting *Knapp*, 536 So. 2d at 1333).  We have also provided limited instruction in a few instances to "resolve an issue of general importance in the administration of justice." *Att'y L*, 511 So. 2d at 121 (citing M.R.A.P. 5(a)).

¶60.   The present case falls under the latter.  We found it necessary to address the malice exception to the confidentiality and the discovery privileges pertaining to Sections 41-63-9 and -23 as a matter of first impression and purely as a question of law. The trial court is in a much better position than this Court to determine whether or not a legal exception may or may not apply to whatever privilege(s) the court has found to exist after its extensive in camera review in the matter.  Mississippi case law addresses the other privileges found by the trial court and the exceptions to these privileges. *See, e.g.*, *Haynes*, 597 So. 2d at 618 (addressing the work-product privilege and what exceptions may apply); *Hewes*, 853 So. 2d

26

at 1244-47 (addressing the attorney-client privilege, along with the work-product privilege and the exceptions to these privileges).

## CONCLUSION

¶61. Dr. Rush's interlocutory appeal is dismissed without prejudice, and the case is remanded for further proceedings.

¶62. **DISMISSED WITHOUT PREJUDICE AND REMANDED.**

**RANDOLPH, C.J., KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, CHAMBERLIN, ISHEE AND GRIFFIS, JJ., CONCUR.**